*In re* MARRIAGE OF VANESSA BUSH, Petitioner-Appellee and Cross-Appellant, and GARRY TURNER, Respondent-Appellant and Cross-Appellee.

Fourth District   No. 4—88—0716

Opinion filed November 9, 1989.

Darrell L. Hartweg, of Luedtke, Hartweg & Turner, of Bloomington, for appellant.

Thomson & Weintraub, of Bloomington (Alan I. Weintraub, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

This appeal follows the dissolution of the marriage of the parties, doctors Vanessa Bush and Garry Turner, on January 21, 1985. The hearing for custody, temporary child support, and visitation was held April 28, 1986. During the next two years, petitioner Bush filed four rules to show cause and hearings were held. The trial court entered its final order on September 20, 1988.

The parties dispute the trial court's finding as to respondent's status in a medical partnership and the inclusion of goodwill in the valuation of the partnership, with eight other issues involving the parties' son, Alan, and relating to child support, custody, and visitation.

The parties, both physicians, were married in 1982. Petitioner, now 33 years old, began her medical career as an emergency room physician at Brokaw Hospital in Normal, Illinois. Respondent, a 34-year-old anesthesiologist, began his medical career at Anesthesia Associates, a medical partnership in Bloomington, Illinois. He is now a partner there.

The parties have one child, Alan V. Turner, born October 10, 1984. Petitioner testified respondent physically and mentally abused her before and during her pregnancy. The parties separated eight days after Alan's birth. Petitioner lived with her parents in Chicago during her six weeks of maternity leave and returned to the parties' home in Bloomington in early December 1984. She and respondent lived in the marital home until January 18, 1985, but never reconciled. The petitioner filed for dissolution in Livingston County on December 12, 1984. The circuit court of Livingston County entered the decree of dissolution of marriage on January 21, 1985, on the ground of mental cruelty.

Petitioner continued to work as an emergency room physician at various hospitals in central and northern Illinois. In May 1986, petitioner married Lawrence Webster, also a physician. She and Alan moved to Dr. Webster's home in Decatur in June 1986. Various baby-sitters, some of them live-ins, cared for Alan while petitioner worked part time at Brokaw Hospital in Normal. In May of 1987, petitioner, Lawrence Webster, and a third party purchased Decatur Urgent Care Center. Petitioner began working at the Decatur Urgent Care Center in October 1987. She is still employed there, and her monthly gross salary is $7,200 per month. Dr. Webster's gross salary is also $7,200 per month.

Respondent continues to work for Anesthesia Associates. His estimated gross salary for 1987 was approximately $299,739, or $24,978 per month. Respondent has not remarried.

On April 28, 1986, the circuit court of Livingston County held a hearing on petitioner's petition for temporary custody and child support and on respondent's petition for temporary visitation. The court's temporary order provided for joint temporary custody, with primary physical custody remaining with petitioner. Respondent was to pay $1,000-per-month child support: $800 directly to petitioner and $200 to a uniform gift to minor or other similar account. The order provided respondent with temporary physical custody on alternate Wednesdays through Sundays and visitation on certain holidays and birthdays. The order also included elaborate instructions on transporting the child for visitation, as the parties could not reach agreement on the matter. On its own motion, the Livingston County circuit court ordered the case transferred to McLean County on November 6, 1986.

During the two years between issuance of the temporary and final orders, respondent paid $4,833 to petitioner as temporary child support. By March of 1988, temporary child support arrearages totalled $12,567. Petitioner filed several rules to show cause during the same period. Respondent admitted he did not make temporary child support payments as ordered and gave five reasons for refusing to pay, none related to ability to pay. First, he alleged petitioner denied him visitation rights as he did not know the whereabouts of his son for seven weeks following petitioner's marriage to Lawrence Webster. Second, respondent cited two brief confrontations between himself and petitioner in August and September of 1986. Testimony from each party indicates respondent had the child pursuant to court-ordered visitation. There was confusion or disagreement over the length of the child's stay with his father on each occasion, and petitioner entered respondent's home uninvited to remove the child. Physical confrontations resulted. The third reason given for refusing to pay child support was petitioner never told respondent how she intended to use the monies to support the child. Next, respondent claimed he should not pay temporary child support because he had custody of Alan eight days each month and contributed directly to Alan's support during those days. Finally, respondent refused to pay temporary child support because he believed all the child's needs were already being met.

Respondent did establish a $1,600 certificate of deposit (CD) in the child's name in 1986, pursuant to the court's order that he place $200 per month in trust. He established an irrevocable trust for the child in August 1987. He testified petitioner refused to serve as co-trustee.

At a hearing in March 1988, the court found temporary child support arrearages of $12,567. The court declined to hold respondent in

contempt of court for his failure to make payments, but ordered him to establish a trust fund for the child of $12,567.

The court entered its final order on September 20, 1988. The court awarded joint custody, physical custody to remain with petitioner during the school year. During the school year, Alan will visit his father on alternate weekends and will live with his father for approximately two months each summer. During summer visitation, petitioner has absolutely no visitation rights. This visitation schedule will begin when the child enters kindergarten. Until then, the visitation schedule established under the temporary order remains in effect. The court ordered respondent to obtain a $100,000 life insurance policy "to guarantee payment of child support" and to name as beneficiary the trust he had been directed to establish for temporary child support arrearages. The court ordered respondent to establish a trust fund on behalf of the child of $18,767. This amount included temporary child support arrearages, the CD, and monies in the trust fund respondent had already established pursuant to the temporary order.

Respondent is to pay $800 per month from Anesthesia Associates directly to petitioner for child support. He is to continue to contribute to the trust fund according to the following formula: "Respondent's payments into the trust fund shall be in an amount equal to 20% of his net income as defined by statute less the cost of the $100,000 life insurance policy premium *** and the $800 per month cash support payments to petitioner ***." The court found respondent in contempt of court for failing to pay $225 in temporary child support between March and June of 1988. Respondent was sentenced to seven days in jail, but could purge himself by paying $225 immediately to petitioner. Finally, the order divided marital property between the parties. The dispute involving property division relates to respondent's partnership status in Anesthesia Associates and valuation of the partnership interest. Respondent contends a partnership interest did not exist at the time of the January 21, 1985, dissolution.

Dr. Gilbert Causey, one of the founders of Anesthesia Associates, testified that the partnership's usual practice is to hire an anesthesiologist for one year as an employee with a guaranteed salary for that year. During the employee's first year of employment, partnership for the employee is discussed among the partners. All previous employees were offered partnership during the first year and began their second years with the firm as partners, earning a guaranteed salary plus a percentage of the partnership's net profits for the year. Each entered a "standard written contract" designed for new partners. Upon leaving the partnership, former partners are entitled to their percentages

of accounts receivable.

Respondent began working for Anesthesia Associates on August 1, 1983. He was hired as an employee of the partnership with a guaranteed first-year salary of $90,000. Anesthesia Associates discussed partnership with respondent during his first year, but did not offer him partnership as both sides had doubts about his remaining with the firm. Respondent and the partnership orally agreed respondent would remain for a second year (August 1984 through August 1985) as an employee, to allow the partnership additional time for evaluation. Respondent's guaranteed salary for his second year of employment was $100,000. If his earnings exceeded the $100,000 guaranteed salary during that second year, respondent was additionally entitled to 16% of the partnership's net profits for the year. Had respondent left the partnership during his second year, Dr. Causey testified respondent would not have had access to additional partnership funds.

Dr. Causey testified there was no written agreement between Anesthesia Associates and respondent detailing the terms of respondent's second year of employment. Dr. Causey did testify that the partnership drafted a partnership contract for respondent toward the end of his first year of employment. This written contract shows a guaranteed salary for the second year of $100,000 plus 16% of net profits for earnings over $100,000. The contract was never signed by the partnership or by respondent because the partners did not want respondent to have access to the firm's accounts receivable. Respondent was not listed on the partnership's 1983 tax return, but was listed as a partner on the firm's 1984 tax return. Dr. Causey testified respondent was listed in 1984 because of the net profit percentage agreement that covered respondent's second year of employment. Respondent received schedule K-1 for 1984, the partner's share of income, credits, and deductions. Respondent also received 16% of the partnership's net profits from September through December 1984 because his earnings exceeded $100,000 for the year.

Dr. Causey testified he believed respondent did not become a partner until the end of his second or beginning of his third year of employment, August or September 1985. At that time, he became 100% vested in the partnership's accounts. His profit percentage increased to 17.5% of the partnership's net profits.

■ The trial court found respondent was a partner on the date of the dissolution of the marriage, January 25, 1985, which fell during respondent's second year with Anesthesia Associates, stating:

> "It is apparently true that a written partnership agreement was never agreed upon or executed by the parties, but I do

find that he did act like a partner, he did receive schedule K-1 as if he was a partner, and the only reason that the partnership agreement was not executed was because there was some uncertainty on his part as to whether he was going to stay in town, and the parties had reached an agreement to what was going to happen in the event that he didn't, and that was the only reason why he did not get a \*\*\* written partnership agreement."

Respondent argues this finding was against the manifest weight of the evidence.

"Manifest weight has been defined as that weight which is clearly evident, clear, plain and indisputable. [Citations.] We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of fact, have come to a different conclusion. [Citations]." *Laroia v. Reuben* (1985), 137 Ill. App. 3d 942, 946, 485 N.E.2d 496, 499.

■ The trial court was in the best position to hear the testimony and, most importantly, to evaluate the credibility of the witnesses. We find the decision of the trial court, that respondent was a partner in Anesthesia Associates on the date of the dissolution of the marriage, was not contrary to the manifest weight of the evidence.

Respondent next argues the trial court erred in valuing his interest in Anesthesia Associates.

■ Goodwill has been accepted as a proper consideration in determining the value of a marriage dissolution party's interest in professional partnerships or corporations. (*In re Marriage of Stone* (1987), 155 Ill. App. 3d 62, 73, 507 N.E.2d 900, 907 (a law practice); *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 36-37, 495 N.E.2d 659, 662-63 (a medical corporation); *In re Marriage of White* (1981), 98 Ill. App. 3d 380, 384, 424 N.E.2d 421, 424 (a dental corporation).) In *Stone*, the court states:

"A number of courts have adopted a method for valuation of a partnership or professional practice which includes consideration of:

(a) Fixed assets which include cash, furniture, equipment, supplies and library;

(b) Other assets, including properly aged accounts receivable, costs advanced with due regard for their collectibility; work in progress partially completed but not billed as a receivable, and where completed but not billed;

(c) Goodwill of the practitioner in his business as a going concern; and

(d) Liabilities of the practitioner related to his business."
*Stone,* 155 Ill. App. 3d at 72, 507 N.E. 2d at 906-07.

Respondent's expert was Charles Dunbar, accountant for Anesthesia Associates for 25 years. Dunbar valued respondent's interest in Anesthesia Associates on January 25, 1985, at $68,358, which was 16% of the tangible assets of Anesthesia Associates. He relied on the terms of the unsigned written agreement in making the valuation. He did not consider or include goodwill because, under the terms of the agreement, had respondent been a partner and withdrawn from the firm, he would have been entitled only to his percentage of cash and receivables, not to goodwill.

Petitioner's expert witness was Dennis Knobloch, a certified public accountant. He valued respondent's interest in Anesthesia Associates on January 25, 1985, at $179,307. He included goodwill ($141,284) in his valuation.

■ The trial court found respondent's interest in Anesthesia Associates on January 25, 1985, was $101,500. Respondent argues this was erroneous; petitioner argues the figure is arbitrary and against the manifest weight of the evidence. However, the testimony from the two experts presented conflicting opinions which could well justify the court's decision fixing valuation less than the $179,307 and higher than the erroneous (because of the failure to include goodwill) $68,358. We affirm the trial court's valuation of respondent's partnership interest.

■ ■ We now turn to the issues involving child support, custody, and visitation. Petitioner argues the trial court abused its discretion when it ordered respondent to place child support arrearages in a trust fund for the child. We agree. The law in this State is clear: "[P]ast-due installments of child support are the vested right of the designated recipient; thus, the court lacks the authority to modify those amounts that have already accrued." (*In re Marriage of Erickson* (1985), 136 Ill. App. 3d 907, 914, 483 N.E.2d 692, 698; see also *In re Marriage of Burrows* (1984), 126 Ill. App. 3d 752, 757, 467 N.E.2d 987, 991; *Jones v. Meade* (1984), 126 Ill. App. 3d 897, 902, 467 N.E.2d 657, 661; *In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 512, 436 N.E.2d 228, 235.) The court's order, requiring respondent to establish a trust fund with the arrearages, was not legally justified under the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1987, ch. 40, pars. 503(g), 510), and deprived petitioner of a vested right.

If the temporary child support arrearages have been put into trust, the monies are to be taken out of trust and paid immediately to

petitioner. If respondent has not yet established this trust, he is to be ordered to immediately pay petitioner the $12,567 owed as temporary child support.

▮▮▮ Petitioner argues the trial court erred on March 15, 1988, when it did not find respondent in contempt for his refusal to pay temporary child support as ordered. Petitioner argues this decision was against the manifest weight of the evidence and urges this court to reverse and find respondent in contempt. We decline to do so. Enforcement of support payments by contempt is in the sound discretion of the court. (*Welch v. Welch* (1950), 340 Ill. App. 639, 92 N.E.2d 355 (abstract of opinion).) While section 505(b) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 505(b)) provides for the use of contempt proceedings, because of the complexities of dissolution matters, we are reluctant to change a fact finder's determination as to the use of this power. The trial court's decision to deny a contempt finding at this juncture of the case was not against the manifest weight of the evidence. "Whether the person charged is in wilful contempt and whether a sanction is to be imposed are factual matters to be determined by the trial court from the evidence presented to it." As a reviewing court, we will not disturb the trial court's decision unless contrary to the manifest weight of the evidence or an abuse of discretion. *In re Marriage of Hilkovitch* (1984), 124 Ill. App. 3d 401, 420, 464 N.E.2d 795, 807.

The next issue raised on appeal by both parties concerns the child support award. The trial court's order for child support required payment of $800 per month from Anesthesia Associates to petitioner. Additionally, respondent was to make payments into an already established trust fund. The payments into the trust were to be for an amount equal to 20% of respondent's net income as defined by statute (Ill. Rev. Stat. 1987, ch. 40, par. 505), less the costs of the $100,000 life insurance policy premiums and the $800-per-month cash support payments made to petitioner. Respondent argues the child support award is excessive because it is far more than the amount necessary to meet the child's reasonable and necessary support needs, particularly in light of each parent's separate abilities to financially care for the child. Petitioner argues the award is insufficient because, according to her calculations, $800 per month is only 6% of respondent's monthly net income.

▮ In making child support awards, trial courts are to consider the following factors:

   "(a) [T]he financial resources of the child;

   (b) the financial resources and needs of the custodial parent;

(c) the standard of living the child would have enjoyed had the marriage not been dissolved;

(d) the physical and emotional condition of the child, and his educational needs; and

(e) the financial resources and needs of the non-custodial parent." Ill. Rev. Stat. 1987, ch. 40, par. 505(a)(2).

"The amount of an award of *** child support is a matter within the sound discretion of the trial court, and the award will not be disturbed on appeal absent an abuse of discretion. Such an abuse of discretion occurs only where no reasonable man would take the view adopted by the trial court. *In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808, 812." *In re Marriage of Adams* (1988), 174 Ill. App. 3d 595, 617, 528 N.E.2d 1075, 1088.

The trial court's overall award of 20% of respondent's net income was excessive for a child of such tender years and, as such, constituted an abuse of discretion. Additionally, the use of a trust as a reservoir for that portion of the 20% not directly paid to petitioner was improper. The trial court believed respondent should not be required to pay 20% of his net income directly to petitioner. There is testimony that respondent's net monthly income is approximately $13,000, or $156,000 annually. An award of 20% of respondent's income is approximately $30,000 per year, or more than the average income of most Americans. We have great reservation about finding one four-year-old boy entitled to such a sum. Presumably, the trial court felt the same and devised the formula involving the $800 monthly cash payment, the life insurance policy, and the trust, in order to moderate the cash amount paid for support but yet comply with the guideline figure. We now hold that where the individual incomes of both parents are more than sufficient to provide the reasonable needs of the parties' children, taking into account the life-style the children would have absent the dissolution, the court is justified in setting a figure below the guideline amount.

The court must clearly state the basis for setting a figure below the guidelines, as required by the statute. However, a reasonable basis exists where both parties have more than enough income to provide for a child, and an award of 20% of the noncustodial parent's income exceeds the bounds of anything the child can reasonably need or desire. Certainly, there will be instances where a high child support figure will be warranted. If the situation involved high medical expenses or, when the boy gets older, he is sent to an expensive, private grammar school, a child support figure approaching 20% of respond-

ent's income might be justified. This is not such a case. There is no evidence of unmet needs, and the arguments of both parties devolve into a dispute over life-style.

Our courts have recognized that in fixing child support, or in modifying child support, a court must consider the standard of living the child would have enjoyed absent parental separation and marital dissolution. (See *In re Marriage of Bussey* (1984), 128 Ill. App. 3d 730, 734, 471 N.E.2d 563, 566, *aff'd* (1985), 108 Ill. 2d 286, 483 N.E.2d 1229; *In re Marriage of Leva* (1983), 125 Ill. App. 3d 55, 57, 460 N.E.2d 1179, 1180-81; *In re Marriage of Hilkovitch* (1984), 124 Ill. App. 3d 401, 417, 464 N.E.2d 795, 805; *In re Marriage of Fairchild* (1982), 110 Ill. App. 3d 470, 477, 442 N.E.2d 557, 562.) Despite the requirement that a court consider a child's station in life, the courts are not required to automatically open the door to a windfall for children where one or both parents have large incomes. A large income does not necessarily trigger an extravagant life-style or the accumulation of a trust fund. A large increase in income will not necessarily result in an equal change in one's life-style. There are other rational options for an individual with a large income than just conspicuous consumption. The wealthy person may prefer personal frugality, or the enrichment of others through charitable giving, or simply deferring income through tax-delay investments, in order to build an estate. Keeping in mind the fact that this case involves incomes for both mother and father which are far above average, we know of no rule of law requiring excessive child support so that the child (or the custodial parent) can diminish the accumulation of an estate by the noncustodial parent. We are not required to equate large incomes with lavish life-styles. Neither are the courts required to provide opulence and excess as an award for child support simply because it exists for one of the parties.

In the instant case, petitioner's argument for a 20% award is centered on respondent's income. The evidence in the record of the typical expenditures for Alan tend to support an award closer to the $800 figure set by the court. In sum, the court has the leeway to set an award below the guideline figure in a case such as this. Alan's needs are provided for, and then some. Nevertheless, the noncustodial parent must provide support for his child. The court must accommodate the reasonable needs of the child with the available means of the parents. (See *In re Marriage of Rundle* (1982), 107 Ill. App. 3d 880, 883, 438 N.E.2d 229, 231.) The Act was not intended to create windfalls but, rather, adequate support payments for the upbringing of the children. We remand this issue to the trial court for determination of

a reasonable specific monthly support amount.

■■ Additionally, we hold it was improper to order the creation of a trust in this case. The court's ruling leaves the impression that an attempt was being made to comply with the 20% guideline. The statutory provision allowing creation of a trust is section 503(g) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(g)), which states:

"The court if necessary to protect and promote the best interests of the children may set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education, and general welfare of any minor, dependent, or incompetent child of the parties."

Section 503 is the property division provisions of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 503), while section 505 of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 505) provides for child support and the enforcement thereof. Section 505 does not provide for trusts.

■■ We agree that a trust may be appropriate where a parent has shown unwillingness to pay support as ordered by the court. (*In re Marriage of Bates* (1986), 141 Ill. App. 3d 566, 571, 490 N.E.2d 1014, 1017; *In re Marriage of Rochford* (1980), 91 Ill. App. 3d 769, 782, 414 N.E.2d 1096, 1106-07.) However, the present case is somewhat similar to the *Bates* case, where regardless of the filing of five petitions for rule to show cause, the trust was not allowed. We hold the facts in the present case do not establish the special circumstances justifying the use of section 503(g). We believe, unless respondent has severe emotional problems, the contempt powers will be adequate to enforce future support payments.

We also condemn the trust because it did not allow the use of the corpus during minority. This is not in compliance with the provisions of section 503(g), and appears to be an unlawful court-ordered inheritance. We further note the contributions to the trust were to be from current income, rather than from property.

■■ Both parties appealed the award of joint custody, and each argued for sole physical custody. Section 602.1 of the Act sets forth the criteria for an award of joint custody. Either party can move for an award of joint custody, or the court can make the award on its own motion. Custody is determined pursuant to the terms of a joint parenting agreement or order. The parents are to determine the terms of the agreement, which specifies each parent's powers, rights, and responsibilities for the care of the child and for major decisions such as education, health care, and religious training. The agreement is to establish a procedure for dispute resolution and periodic review

of its terms. If the parents are unable to formulate such an agreement, the court shall decide the terms of a joint custody arrangement. (Ill. Rev. Stat. 1987, ch. 40, par. 602.1(a).) Neither the court nor the parties formulated such an agreement here.

> "The propriety of such an arrangement is dependent upon the following: the best interests of the child, agreement of the parents and their mutual ability to cooperate, geographic distance between the parents, desires of the child if of a suitable age, and the relationships previously established between the child and his parents. Since joint custody requires extensive contact and intensive communication, it cannot work between belligerent parents. Scott, *Joint Child Custody—An Exception*, 64 Chicago Bar Record 406 (1983).
>
> This court, in the case of *In re Marriage of Manuele* (1982), 107 Ill. App. 3d 1090, 1094, 438 N.E.2d 691, 694, discouraged the awarding of joint custody, specifically noting that such orders are usually unworkable and should be rarely entered. \*\*\* Finally, we noted that unless parents have an unusual capacity to cooperate, substantial disagreement shall arise, ultimately resulting in harm to the child." *In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 679-80, 509 N.E.2d 707, 712-13.

We reversed the joint custody award made in the *Drummond* case because there was no joint parenting agreement or order, mediation between the parties failed, testimony indicated the parties were unwilling to cooperate with each other, and the trial court failed to consider geographic distance between the parties (one lived in Illinois, the other in Texas).

The award of joint custody in this case was manifestly an abuse of discretion. The parties have repeatedly exhibited hostility toward each other, sometimes resulting in physical confrontation. Counsel for both parties agreed at oral argument that there is little chance of the parties ever overcoming their mutual feelings of animosity. Most importantly, the record clearly indicates the parties have been unable, since Alan's birth, to cooperate on matters involving their son. Joint custody will only insure continuing litigation. See *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 455 N.E.2d 887.

The record in this case indicates that the petitioner is the proper custodial parent. She has been the child's primary physical custodian since his birth. The trial court indicated that for the immediate future, this relationship should continue, thus clearly indicating a preference on the issue of custody. We conclude custody must be awarded to petitioner.

■ Because this cause will be remanded, one purpose being the determination of proper visitation, we find it necessary to comment on the trial court's previous order granting the respondent uninterrupted visitation for two months during the summer. The child is of tender years. The mother has basic custody for 10 months a year. The parties live approximately 50 miles apart. An excellent highway exists between the cities of Decatur and Bloomington. There is no justification for denying the custodial parent some contact with her son during the two-month visit with respondent.

This is one more case involving child custody and visitation which brings us distress. It is sad when parties with at least above-average degrees of intelligence (which we assume graduates of medical school have) lose the ability to make reasonable decisions when it comes to child custody and visitation. Our years of handling such cases have proved the main result of the conflict is unnecessary damage to the child or children, the most valuable and continuing asset of the marriage relationship.

In summary, we affirm the trial court's findings relating to property distribution. We reverse the order of joint custody and mandate an award of custody to the petitioner mother. We reverse the provision allowing two months' uninterrupted visitation with respondent father and direct the trial court to provide for changes in visitation consistent with the dictates of this opinion. The trial court may, if it deems necessary, have additional hearings relating to the visitation issue. We reverse the trial court's order creating a trust and order an additional hearing for purposes of fixing child support consistent with the dictates of this opinion. We reverse the trial court's order relating to vested unpaid child support, and mandate an order directing respondent to pay the arrearage forthwith.

Affirmed in part; reversed in part; and remanded with direction.

KNECHT and SPITZ, JJ., concur.