*In re* MARRIAGE OF YONG SUN LEE, Petitioner-Appellee, and JOHN C. LEE, Respondent-Appellant.

Fourth District   No. 4—92—0859

Argued May 11, 1993.—Opinion filed June 29, 1993.—Rehearing denied July 29, 1993.

Darrell E. Statzer, Jr. (argued), of Wilson, Dyar, Moss & Statzer, and Michael I. Campbell, of Hull, Campbell & Robinson, both of Decatur, for appellant.

Frederick P. Erickson (argued), of Erickson, Davis, Murphy, Griffith & Walsh, Ltd., of Decatur, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Respondent, Dr. John Lee, appeals the provisions of the circuit court of Macon County's order of dissolution regarding custody, child support, maintenance, and apportionment of marital assets. We affirm.

## I. FACTS

John and Yong Sun Lee were married in Korea on December 24, 1973. Both parties completed their formal education prior to the marriage. John is a medical doctor, and Yong Sun has a master's degree in commercial art. After the marriage, the parties lived together for one week in Korea, were separated for five months, and then lived together for three months in Los Angeles. The parties then moved to Iowa City, Iowa, where John completed a four-year residency in ophthalmology. John's salary during his residency was approximately $15,000 to $21,000 per year; John earned about the same amount by "moonlighting." Yong Sun was employed as a commercial artist during most of this time. Her earnings were small, and she gave them to John, who managed the couple's finances. The Lees' first child, Anna, was born in 1978. After the birth of Anna, the Lees moved to Washington, D.C., where John had a fellowship for further specialization in the ophthalmology field. John earned $25,000 to $30,000 per year during his fellowship. Yong Sun did not work while the parties lived in Washington, D.C, but stayed home to care for Anna.

In 1979 the Lees moved to Decatur, where John began his medical practice. Erick was born in 1981. Yong Sun found employment three months after they arrived in Decatur. From that time until 1985, Yong Sun was employed as a commercial artist and in a clothing store. In 1985, Yong Sun opened her own business, a clothing store. At first Yong Sun gave her earnings to John, but after a while she retained them.

Beginning in 1985, John refused to file a joint income tax return with Yong Sun, and did not discuss the details of his income and financial affairs with her. John gave Yong Sun money for the purchase of items for the house. There were additionally infrequent extravagant expenditures; for example, John gave Yong Sun a diamond sapphire ring worth $9,000, a diamond watch worth $4,000, a

diamond and pearl ring worth $5,000, and a replacement wedding ring worth $20,000. The exhibits introduced at trial indicate John's gross income was $341,637 in 1991, $355,568 in 1990, $458,805 in 1989, and $401,811 in 1988, for an average of $389,455.25 per year. Yong Sun's gross income for the same time period averaged $19,000 per year.

In 1986, John began transferring marital funds to his children for college savings. Yong Sun was not advised of the transfers to the children. In 1986, 1987, and 1988 John transferred $10,000 to Totten trusts, one for the benefit of each child. Thus, in 1986 through 1988, John transferred a total of $20,000 per year to his children. In late 1989, the Lees were undergoing marital difficulties and were discussing separation and divorce. On October 11, 1989, John used $81,404 of marital funds to purchase college bonds for Anna. On December 11, 1989, John used $45,315 of marital funds to purchase college bonds for Erick. On December 22, 1989, two weeks before the Lees separated, John transferred $20,000 of marital funds to each child's Totten trust, for a total of $40,000. On January 4, 1990, the day of separation, John transferred $100,000 to an irrevocable trust for the benefit of Erick and Anna, naming John's relatives as contingent beneficiaries.

Yong Sun filed for divorce in 1979 and 1987. However, she indicated she did not follow through with these actions due to her upbringing, her failure to realize their situation would not improve, and John's indications things would improve. John and Yong Sun obtained counseling at the Mayo Clinic in Minnesota in 1988, a counseling center in Florida in 1990, and locally. John testified he did not believe he had a problem, but believed Yong Sun is emotionally unstable. Yong Sun has been prescribed psychiatric drugs, but does not take them.

The parties separated in January 1990. Yong Sun filed this action in February 1990. During the pendency of this action numerous petitions have been filed regarding visitation, support, orders of protection, and the like. Anna, the eldest child, died during this time.

At trial the contested issues regarded custody of Erick, support, and the valuation and apportionment of marital assets. The parties testified they had marital difficulties since the inception of the marriage. Yong Sun testified John began beating her within a week of her arrival in the United States, and the beatings continued on a daily basis for 15 years. Yong Sun testified she kicked John in self-defense. John denied beating Yong Sun, but testified he believed

her to be a great actress. According to John, Yong Sun would fall down when in close proximity to him, to convey the illusion to others that he had struck or pushed her. Erick testified he had witnessed John hitting Yong Sun. Erick additionally testified the only times he saw Yong Sun hit John were when John was shoving or hitting her.

Evidence of erratic behavior on the part of both parties was presented. Several witnesses, including the parties, testified to public confrontations between John and Yong Sun regarding visitation. Testimony was introduced regarding John forcing the children into his van and driving the van back and forth rapidly; John testified Yong Sun had ripped a telephone from the wall and knocked over furniture.

The trial court awarded custody of Erick to Yong Sun, subject to John's right to visitation, and ordered John to pay $3,000-per-month child support, and $2,000-per-month maintenance. The trial court found John dissipated marital assets and had a greater earning potential than Yong Sun. Accordingly, the trial court awarded Yong Sun a greater share of the marital assets. Yong Sun was awarded the marital home ($130,000 less a $60,000 mortgage), her business ($40,000), jewelry ($38,000), her car ($7,500 to $10,000), the Merrill Lynch account ($130,000 less a fee award of $20,000 to her attorney), the Fidelity money market account ($133,000), the Shearson-Lehman account ($50,000), Anna's Shearson-Lehman account ($82,000), half of the pension and profit-sharing plans ($200,000), and half of the individual retirement accounts (IRAs) ($12,500). John was awarded his medical practice ($400,000), half of his pension and profit-sharing plans ($200,000), and half of the IRAs ($12,500). Yong Sun was awarded the contents of the marital residence and John was awarded the contents of his apartment. John appeals.

## II. Division Of Marital Property

John alleges the trial court erred in apportioning the marital property, because (1) its finding he had dissipated assets was against the manifest weight of the evidence, (2) its findings regarding the valuation of his medical practice were against the manifest weight of the evidence, and (3) the award of more marital assets to Yong Sun than to him was not equitable.

### A. *Dissipation*

John argues the trial court erred in finding he dissipated mari-

tal assets by transferring $166,719 of marital assets to the children during the three months of the marriage prior to separation, and $100,000 to an irrevocable trust for the benefit of the children, with his niece and nephew named as contingent beneficiaries, on or about the day of separation. John argues these transfers, totaling $266,719, did not constitute a dissipation of marital assets because they were not for his sole benefit and for a purpose unrelated to the marriage. A trial court's allocation of marital property, including making allowances for dissipation, will not be reversed absent an abuse of discretion. Such discretion will be considered abused only when no reasonable person would agree with the decision reached by the trial court. *In re Marriage of Hagshenas* (1992), 234 Ill. App. 3d 178, 194, 600 N.E.2d 437, 448.

One of the factors considered by the trial court in determining the allocation of marital property is the dissipation by each party of the marital or nonmarital property. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1).) The statute does not define "dissipation"; however, the Illinois Supreme Court has held dissipation refers to the " 'use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.' " (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 497, 563 N.E.2d 494, 498-99, quoting *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210.) Whether a given course of conduct constitutes dissipation within the meaning of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 101 *et seq.*) depends on the facts of the particular case. *In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 683, 509 N.E.2d 707, 715.

A transfer of marital assets does not escape classification as dissipation merely because it is to, or for, the benefit of children of the marriage. Expenditures for the children's immediate reasonable needs is a permissible use of marital funds. However, excessive expenditures, even if for a permissible purpose, may constitute a dissipation of marital assets. (See *Hagshenas*, 234 Ill. App. 3d at 197, 600 N.E.2d at 451.) In *Hagshenas*, the court indicated one spouse's expenditures for his or her living expenses during the breakdown of the marriage would be a proper use of marital funds. However, the court stated:

> "It is entirely within the realm of possibility that one spouse's use of marital funds for his or her own living expenses at a time when the marriage is undergoing an irreconcilable breakdown could be shown to be so selfish and exces-

sive and improper as to constitute an outright waste of marital funds." (*Hagshenas*, 234 Ill. App. 3d at 197, 600 N.E.2d at 451.)

In a similar vein, a transfer of $266,719 to two children, aged 8 and 11, may be considered so in excess of their reasonable needs that its primary purpose was for John's desire to remove marital assets from the reach of Yong Sun. Accordingly, such a transfer may be regarded as a dissipation of marital assets.

■ John argues where one spouse has a pattern of conveying marital assets to another which was established prior to the breakdown of the marriage, conveyances which are part of that pattern, made during the breakdown of the marriage, should not be considered to be dissipation of marital assets. While this argument may be acceptable in the appropriate case, we find John's pattern of conveying $10,000 per year, per child for savings and educational purposes does not support the transfer of $266,719 to the children in the three months before the separation of the parties. *In re Marriage of Aud* (1986), 142 Ill. App. 3d 320, 491 N.E.2d 894, cited by John does not convince us otherwise.

In *Aud*, the trial court found the husband's expenditure of nearly $70,000 of marital funds for the support of his mother was not a dissipation of marital assets. Two of the reasons advanced by the trial court for this holding were (1) the husband spent approximately the same amount for his mother's support for years prior to the breakdown of the marriage, and (2) the wife did not object to the expenditures at the time they were made. (*Aud*, 142 Ill. App. 3d at 331, 491 N.E.2d at 901.) Neither of these factors is present in this case. First, the amount conveyed by John in the months prior to the separation was not comparable to the yearly amounts previously transferred. Rather, respondent's conveyances to the children in the three months prior to the separation exceeded his normal annual conveyance by $246,719. At trial respondent testified the reason for a larger than normal conveyance was that in October and December 1989, he was offered a rare opportunity to purchase college bonds. He determined he should take advantage of this opportunity and purchased bonds at a cost of $126,719. However, respondent's testimony regarding this "rare opportunity" was not corroborated. Moreover, even if accepted as true, it does not explain the sudden cash transfer of $40,000 to the children, or $100,000 to a trust for the benefit of the children.

Second, unlike the situation in *Aud*, where the other spouse was aware of the conveyances but did not object, Yong Sun did not ac-

quiesce to the conveyance of marital assets to the children. Nor did Yong Sun have an opportunity to object, because she was not apprised of the conveyances. *Aud* is not applicable to the facts of this case. We conclude John's practice of transferring $20,000 per year to the children does not establish the conveyance of $266,719 to the children in the three months prior to separation was part of an established pattern, rather than a dissipation of marital assets.

Finally, we note the expenditure did not benefit the joint marital enterprise, but, rather, was of primary benefit to John. As Yong Sun correctly notes, although the funds were transferred for use by the children for their education, this is an expense which would most likely have been borne by John. Thus, by funding the children's education with marital funds, John has effectively shifted a portion of the children's educational expense from himself to Yong Sun.

Simply put, were there no accounts, bonds, or trusts established for the education of the children, it is probable that John, who had an average gross income of $389,455 in the four years prior to the dissolution, as opposed to Yong Sun's less than $20,000, would bear the bulk of the higher educational expenses of the children. Assuming an equal distribution of marital assets, $133,359.50 of the $266,719 conveyed by John would have been awarded to Yong Sun. Thus, if the transfer is not regarded as a dissipation, John has effectively shifted $133,359.50 of the children's educational expenses from himself to Yong Sun.

Moreover, as Yong Sun also correctly notes in her brief, to allow spouses to make transfers of marital assets which automatically escape dissipation treatment if made to the parties' children invites vindictive spouses to make such transfers for the primary purpose of depriving the other spouse of the use of his or her fair share of the marital estate. The result is particularly unequitable, where, as in the present case, the spouse making the unilateral decision to transfer marital funds earns in excess of $300,000 per year and may replenish his share of the marital assets transferred, while the other spouse, earning a substantially lower income, may never be able to replenish her share of the marital assets transferred.

For the foregoing reasons, we affirm the trial court's finding John's transfer of $266,719 to the children, in the three months prior to the separation of the parties, was a dissipation of assets, and was properly considered by the trial court in determining the amount, of the remaining marital assets, to apportion to Yong Sun.

## B. *Valuation of the Medical Practice*

John contends the trial court's valuation of the medical practice at $400,000 was against the manifest weight of the evidence. The valuation of assets in an action for dissolution of marriage is a question of fact for the trial court to determine. Any conflicts in testimony concerning the valuation of such assets are matters to be resolved by the trier of fact. (*In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 975, 605 N.E.2d 670, 677.) A valuation within the range testified to by the parties' experts will not be disturbed on review. *In re Marriage of Stone* (1987), 155 Ill. App. 3d 62, 71, 507 N.E.2d 900, 905.

Both parties presented expert testimony regarding the valuation of John's medical practice, by certified public accountants. Yong Sun's expert valued the medical practice between $451,972 and $546,425. John's expert valued the medical practice between $367,000 and $467,000, if accounts receivable were included, and $100,000 and $249,000 if accounts receivable were not included. Thus, since the trial court's valuation of the medical practice at $400,000 is *below* the range testified to by Yong Sun's expert and *within* the range testified to by John's *own* expert if accounts receivable are included, John will, only be heard to complain if accounts receivable are not properly included in the valuation of a medical practice in a dissolution action.

Accounts receivable should be included in the valuation of a business. (See generally *Stone*, 155 Ill. App. 3d at 72, 507 N.E.2d at 906-07.) In *In re Marriage of Zells* (1991), 143 Ill. 2d 251, 252, 572 N.E.2d 944, 945, our supreme court held contingent-fee contracts are not to be included in the valuation of a business for dissolution purposes. In *Tietz*, we determined *Zells* leaves the practice of including accounts receivable in the valuation of a business unchanged. We concluded:

> "Clearly, future earned fees, like contingent fees, are not marital assets because their value is too speculative and because they are fees earned in the future. Accounts receivable, however, are distinguishable because they are assets already earned with a known value but have not yet been collected."
> (*Tietz*, 238 Ill. App. 3d at 977, 605 N.E.2d at 679.)

Although acknowledging our decision in *Tietz*, John contends accounts receivable should be regarded as similar to contingent-fee contracts, and invites us to reconsider our decision in *Tietz*. We decline the invitation.

## C. *Equitable Allocation of Marital Assets*

John alleges the trial court abused its discretion in distributing the marital assets generally and, specifically, alleges he should have been awarded a $20,000 ring.

The distribution of marital property rests within the sound discretion of the trial court. (*Tietz*, 238 Ill. App. 3d at 979, 605 N.E.2d at 681.) The trial court's distribution of assets will only be disturbed on review when no reasonable person would agree with the decision reached by the trial court. (*In re Marriage of Pittman* (1991), 212 Ill. App. 3d 99, 101, 569 N.E.2d 1278, 1280.) John argues the trial court erred because it operated under the erroneous assumption Yong Sun would be required to pay taxes on $243,000 awarded to her, it considered his accounts receivable both in apportioning assets and making a valuation of the business, and because it failed to consider his greater contribution to the acquisition of assets.

■ With respect to the taxes, John argues the language "and shall pay any taxes due thereon" in the following provisions indicates the trial court erroneously considered Yong Sun's tax liability for this money, in making its award of assets:

"7. From the Merrill Lynch account of approximately $130,000, the petitioner's attorney shall be paid partial attorneys' fees of $20,000. The petitioner is awarded the balance of the Merrill Lynch account and shall pay any taxes due thereon.

8. The petitioner is awarded the Fidelity Money Market account in the approximate amount of $133,000 and shall pay any taxes due thereon."

This language does not indicate the trial court operated under the belief Yong Sun would have to pay taxes on this money in *determining* the *portion* of the marital assets to award to Yong Sun. Rather, it merely indicates an intention by the trial court that if, for any reason, taxes happened to be due on the monies in these accounts, Yong Sun was to be responsible for the taxes.

■ John next alleges the trial court considered his accounts receivable in valuing his business, which was awarded to him, and based the award of a larger percentage of the assets to Yong Sun, in part, on his greater earning potential. John argues the trial court considered his "future income" twice, once in valuing the accounts receivable and again when determining the proportion of the marital assets to award to each party. With respect to the award of

slightly more than half of the marital assets to Yong Sun, the trial court stated:

> "The court realizes that the petitioner is receiving a larger portion of the marital assets than the respondent, however, a portion of that which the court is awarding is to reimburse her for the funds the respondent dissipated, and the respondent's ability to accumulate funds in the future based upon his income is so much greater than that of the petitioner."

John argues the trial court's reasoning was similar to that criticized by the appellate court in *Head v. Head* (1988), 168 Ill. App. 3d 697, 523 N.E.2d 17. In *Head*, the trial court added $117,000 to the value of the husband's medical practice, otherwise valued at $58,000. The court stated the $117,000 was the value of the "stream of future income and the greater than average revenues earned by the corporation." (*Head*, 168 Ill. App. 3d at 700, 523 N.E.2d at 19.) The trial court then considered the husband's future earnings in awarding maintenance. The appellate court reversed, holding future earnings could not be counted once in valuing the asset and again when apportioning marital assets and awarding maintenance. (*Head*, 168 Ill. App. 3d at 701, 523 N.E.2d at 20.) The present case is distinguishable from *Head* in that the trial court did not consider *future* income when valuing John's business. Rather, the trial court considered accounts receivable which are *past*, but not yet collected, income. (See *Tietz*, 238 Ill. App. 3d at 977, 605 N.E.2d at 679.) Thus, in valuing the business, the trial court considered its past-but-not-yet-collected income; in apportioning the assets, the trial court considered John's potential for future earnings. Accordingly, John's future earnings were considered only once.

John next alleges the trial court erred in apportioning the marital assets because it failed to consider his greater contribution to the acquisition of marital assets. John, through his earnings in excess of $300,000 per year, has made a greater financial contribution to the acquisition of marital assets than Yong Sun, who earns less than $20,000 per year. However, the financial contribution to the acquisition of marital assets is only one of several factors to be considered by the trial court in determining an equitable distribution of marital assets. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d)(1).) Among the other factors the court may consider are: the dissipation of the marital property; the duration of the marriage; the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the

spouse having custody of the children; the age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; the custodial provisions for the children; and the reasonable opportunity of each spouse for future acquisition of capital assets and income. Ill. Rev. Stat. 1991, ch. 40, pars. 503(d)(1) through (d)(4), (d)(7), (d)(8), (d)(10).

■ John's greater contribution to the acquisition of marital assets weighs in his favor. However, the other factors weigh in Yong Sun's favor. On balance, the award of more marital assets to Yong Sun was not an abuse of discretion.

Finally, John alleges the trial court erred in awarding Yong Sun the "goodwill" ring because it was a conditional gift. The evidence at trial indicated respondent purchased the ring *with marital funds* and gave it to Yong Sun along with a note stating she was entitled to keep the ring as long as she remained married to him. John alleges that since the parties are no longer married, Yong Sun has failed to comply with the condition, is not entitled to keep the ring, and the ring should be returned to him. John cites *In re Marriage of Severns* (1981), 93 Ill. App. 3d 122, 416 N.E.2d 1235, in support of his position.

In *Severns* we noted there is a presumption all property acquired during the marriage is marital property. (*Severns*, 93 Ill. App. 3d at 125, 416 N.E.2d at 1238, citing Ill. Rev. Stat. 1979, ch. 40, par. 503(b).) However, the presumption may be rebutted by showing it was a gift. (*Severns*, 93 Ill. App. 3d at 125, 416 N.E.2d at 1238.) In *Severns*, Howard Severns alleged a tract of land purchased after the marriage was his nonmarital property because Alice Severns had given her interest in the property to him as a gift. (*Severns*, 93 Ill. App. 3d at 123-24, 416 N.E.2d at 1236-37.) We recognized an interspousal gift could be nonmarital property, but noted it is the donee's obligation to establish a gift was intended by clear and convincing evidence. *Severns*, 93 Ill. App. 3d at 126, 416 N.E.2d at 1238.

Respondent's reliance on *Severns* is misplaced. *Severns* is applicable to cases in which a donee spouse claims property, which would normally be considered marital property, as the donee's nonmarital property. *Severns* does not stand for the proposition a spouse may make a unilateral determination regarding ownership of marital assets which is binding upon a trial court making a distribution of assets in a dissolution action.

Property purchased with marital funds is marital property in which both spouses have an interest. Under *Severns*, an interspousal gift would occur when one spouse (the donor spouse) makes a gift of his or her interest in the marital property to the other spouse (the donee spouse). If the interspousal gift occurs, the donee spouse is in possession of his or her own interest as well as the interest of the donor spouse. The property, accordingly, is converted from the marital property of both spouses to the nonmarital property of the donee.

By conditioning the gift upon the continuation of the marriage, the donor spouse effectively precludes the donee spouse from arguing, during dissolution, that the property is his or her nonmarital property. If the condition is not met, the property remains marital property. Thus, the condition of the gift operates to condition the gift of the donor's interest; it does not determine the ownership of the property if the condition is not met.

One spouse is not empowered to make the unilateral determination regarding ownership of property purchased with marital funds. By conditioning the gift of his interest in the ring to Yong Sun upon the continuation of the marriage, John prevented her from, upon dissolution, claiming the ring as her nonmarital property. However, since the ring was purchased with marital funds, it was a marital asset. The condition did not prevent the trial court from awarding Yong Sun the ring as part of her share of the marital assets.

### III. CUSTODY

John alleges the trial court abused its discretion in awarding custody to Yong Sun. The determination of child custody rests largely within the broad discretion of the trial court. (*In re Marriage of Apperson* (1991), 215 Ill. App. 3d 378, 383, 574 N.E.2d 1257, 1260.) The trial court has a duty to consider all relevant factors, including:

"(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person; and

(7) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." (Ill. Rev. Stat. 1991, ch. 40, par. 602(a).)

After considering the section 602(a) factors, the trial court has the unenviable task of determining the best interests of the child. Great deference must be accorded to that decision since the trial court is in a superior position to judge the credibility of witnesses and determine the needs of the child, and its decision at trial will not be disturbed on appeal unless it is against the manifest weight of the evidence or unless the trial court abused its discretion. *Apperson*, 215 Ill. App. 3d at 383, 574 N.E.2d at 1260-61.

John argues Yong Sun's unwillingness to facilitate a close relationship between him and Erick, Yong Sun's mental health, and her violence toward John weigh in favor of an award of custody to him. We do not find the trial court erred in weighing the factors and determining the custody arrangement which would be in Erick's best interests.

■■ The first factor is not helpful in determining custody because each parent wished to be awarded custody of Erick. The second factor weighs in favor of an award of custody to Yong Sun because Erick indicated a preference in favor of her.

The third factor also weighs in favor of an award of custody to Yong Sun. Yong Sun's witnesses testified she had a good relationship with Erick, and John's witnesses testified he had a good relationship with Erick. Erick's testimony indicated he had a good relationship with his mother but he did not get along with his father. Erick testified his father has "two people inside of him," *i.e.*, when others are around, John is nice, but when John is alone with Erick, he is mean. Erick additionally testified he does not speak his mind when he is around his father because he is afraid of what might happen if he did so. The trial court believed Erick's testimony.

The fourth factor also weighs in favor of an award of custody to Yong Sun. Yong Sun testified if awarded custody, she would not send Erick to boarding school in the near future. John, however, testified if awarded custody he would send Erick to boarding school. The trial court found "that since ERICK has recently lost

his sister, and since he has seen his parents fight through a hotly contested dissolution, he needs some love and attention at this time and does not need to be sent away from both his mother and father to a private boarding school."

The fifth and sixth factors, the mental health of the parties and threats of physical violence, do not strongly weigh in favor of an award of custody to either party. As we stated in *Apperson*, in custody cases, seldom is either parent shown to be perfect. (*Apperson*, 215 Ill. App. 3d at 383, 574 N.E.2d at 1261.) In the present case the court received testimony of violent and erratic behavior on the part of both of the parties. Each of the parties has received psychiatric care or counseling, albeit at the urging of Yong Sun. However, the trial court found "petitioner has been the primary caretaker of ERICK and has a more loving, caring personality than the respondent. Additionally, the respondent has a fairly volatile temper and has struck the petitioner and also struck the children improperly in his reprimanding of the children." The trial court was in the best position to resolve these issues regarding conflicting testimony and credibility.

Finally, the seventh factor also does not strongly weigh in favor of an award of custody to either party. Yong Sun's denial of visitation to John is a consideration in determining her willingness to foster a close relationship between Erick and John. However, John's practice of putting pressure on Erick regarding Erick's preferences in custody matters, complaining about the amount of money he pays to Yong Sun, and threatening Erick that Erick and his mother will go to jail if they do not comply with visitation, also do not reflect a willingness on the part of John to foster a close relationship between Erick and Yong Sun.

In light of the proper application of the section 602(a) factors to the facts of this case, and the trial court's discretion in resolving conflicts in testimony and determining the best interests of the child, the trial court's award of custody to Yong Sun was not an abuse of discretion.

## IV. CHILD SUPPORT

John alleges the trial court erred in ordering him to pay $3,000 per month in child support. The statutory guidelines provide, in the case of one child, the minimum amount of child support which should be ordered is 20% of the noncustodial parent's net income. (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(1).) The trial court may award less child support if, after considering all relevant factors, it

finds a reason for deviating from the guidelines. (Ill. Rev. Stat. 1991, ch. 40, par. 505(a)(2).) In the years 1988 through 1991, John's net income per year has ranged from $235,222 to $326,387. Thus, based upon John's historical earnings, 20% of his net income is $3,920.36 to $5,439.78 per month. Accordingly, the $3,000-per-month child support ordered by the trial court is actually below the statutory guidelines. In ordering this amount of child support, the trial court stated:

"The court realizes this figure is somewhat under the statutory guidelines; however, considering the child's needs and the petitioner's financial status, it is more than adequate to support the child in the same standard that the child would have enjoyed had there been no dissolution."

John alleges the trial court correctly deviated from the statutory guidelines by ordering him to pay less than 20% of his net income; however, he alleges the amount of child support should have been even less. John additionally alleges the trial court's statement that $3,000 per month is "more than adequate to support the child" indicates the trial court knowingly ordered John to pay more than was actually needed.

Determining the amount of child support to be paid by a high-income parent is a difficult exercise for the trial court. Where the individual incomes of both parents are more than sufficient to provide for the reasonable needs for the parties' children, taking into account the life-style the children would have absent the dissolution, the court is justified in setting a figure below the guideline amount. (*In re Marriage of Bush* (1989), 191 Ill. App. 3d 249, 260, 547 N.E.2d 590, 596.) In *Bush*, we reversed an award of 20% of the noncustodial parent's income where such an award was approximately $30,000 per year and both parents were doctors and earned significant incomes. We noted a reasonable basis for high support payments may be warranted in the case of high medical expenses or expensive private education; however, we found *Bush* was not such a case. *Bush*, 191 Ill. App. 3d at 260-61, 547 N.E.2d at 596.

In fixing the child support obligation of a high-income parent, the trial court must balance competing concerns. On one hand, the trial court should not limit the amount of child support to the child's "shown needs," because a child is not expected to live at a minimal level of comfort while the noncustodial parent is living a life of luxury. (*People ex rel. Graham v. Adams* (1993), 239 Ill. App. 3d 643, 645, 608 N.E.2d 614, 616.) The trial court must consider the standard of living the child would have enjoyed absent parental

separation and dissolution. (*Bush*, 191 Ill. App. 3d at 261, 547 N.E.2d at 596.) On the other hand, child support payments are not intended to be windfalls, but rather adequate support payments for the upbringing of the children. *Bush*, 191 Ill. App. 3d at 261, 547 N.E.2d at 596-97.

In *Bush*, we disapproved an award of $30,000 per year for the support of a four-year-old child. The child's custodial parent earned $86,400 gross income per year and had remarried another doctor who also earned $86,400 per year. The present case is distinguishable from *Bush*. In contrast to the four-year-old child in *Bush*, Erick was 10 years old at the time of the dissolution. The testimony indicated, during the marriage, Erick had been afforded frequent opportunities for national and international travel. Nothing in the record indicates such opportunities would not have continued to arise had the parties remained married. Moreover, the record indicates Erick's standard of living has included electronic gadgets, including a facsimile machine in his room, as well as computer equipment used for educational purposes. Clearly, the cost of supporting a 10-year-old child at the standard of living Erick has enjoyed, and would presumably have continued to enjoy, is greater than the cost of supporting the four-year-old child in *Bush*. The evidence additionally indicates Erick requires medical treatment for a respiratory disorder and must have a "breathing machine."

Moreover, in *Bush*, we noted that either parent in *Bush* was financially able to provide for all of the child's needs. (*Bush*, 191 Ill. App. 3d at 260-61, 547 N.E.2d at 596.) In the present case Yong Sun's earnings from her business are less than $20,000 per year. Yong Sun has been awarded significant liquid marital assets, which if invested, will generate an income which will supplement her earnings. However, considering both her earnings and potential investment income, we do not believe she is financially able to make a contribution to the support of Erick equaling that of the custodial parent in *Bush*. It is appropriate in these circumstances for the noncustodial parent to pay a higher amount of child support.

Finally, we do not find the trial court's statement that the child support award was "more than adequate to support the child" was an indication the trial court ordered John to pay child support in excess of Erick's requirements. Rather, the statement is consistent with an appreciation of the above-average standard of living Erick has been provided. Accordingly, we affirm the portion of the order requiring John to pay $3,000-per-month child support.

## V. Visitation

John argues the trial court erred in restricting his visitation with Erick. As John correctly notes, a court is required to grant reasonable visitation rights unless it finds visitation would seriously endanger the child's physical, mental, moral, or emotional health. (Ill. Rev. Stat. 1991, ch. 40, par. 607(a).) No finding of serious endangerment was made in the present case, and a restriction on John's visitation would, accordingly, be inappropriate. However, we do not find the trial court restricted John's visitation. A restriction of visitation is an action which limits, restrains, or confines visitation within bounds. A termination of visitation is a restriction, as is a prohibition on overnight visitation. Likewise, a requirement that visitation be supervised, occur in the home of the custodial parent, or outside the home of the noncustodial parent is a restriction. However, eliminating one day from a weekend visitation or shortening a summer visitation due to the activities of the child is not a restriction. *In re Marriage of LaTour* (1993), 241 Ill. App. 3d 500, 504, 608 N.E.2d 1339, 1343.

In the present case, John tendered a recommendation regarding visitation to the trial court. In awarding visitation to John, the only variations between the recommendation and the visitation awarded were as follows: (1) John requested, but was not awarded, an overnight visitation during the week; (2) John requested an overnight visitation on major holidays, but was granted daytime visitation on these holidays and half of Erick's Christmas vacation; (3) John requested an eight-week summer visitation, but was granted a two-week summer visitation; (4) John requested, but was not granted, visitation for travel to national and international ophthalmology meetings. We do not believe the "denial" of these requests—the court's failure to adopt John's recommendations—amounted to a restriction on visitation. John was granted visitation with Erick, such visitation included weekend overnight stays, and two weeks in the summer, as well as provision for holidays and other special events.

■ The visitation provisions of the dissolution order do not rise to the level of a restriction on visitation. The trial court did not err with respect to its order regarding visitation.

## VI. Maintenance

■ John alleges the trial court erred in ordering him to pay maintenance to Yong Sun, in the amount of $2,000 per month. Sec-

tion 504(a) of the Act provides maintenance may only be awarded where the spouse seeking maintenance:

"(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income." (Ill. Rev. Stat. 1991, ch. 40, par. 504(a).)

The goal of the Act is to terminate financial interdependence of former spouses wherever possible and to award maintenance only where one spouse is not adequately provided for through other means. Thus, where the earning powers of the former spouses are disproportionate, there is a preference for providing for the former spouse through a greater award of the marital assets, rather than an award of maintenance. In the present case, the Lees had significant marital assets and slightly more than half were awarded to Yong Sun. However, the earning powers of the parties remain significantly disparate. Although the liquid marital assets awarded to Yong Sun, if invested, will supplement her earnings, she still will be unable to enjoy a standard of living equal to that experienced during the marriage. Although we might have awarded less maintenance than that awarded by the trial court, we do not find the trial court's award was against the manifest weight of the evidence.

VII. CONCLUSION

The judgment of the circuit court of Macon County is affirmed.

Affirmed.

COOK and LUND, JJ., concur.