NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250296-U

NO. 4-25-0296

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 16, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JONATHON P., | ) | Jo Daviess County |
|     Petitioner-Appellant, | ) | No. 23DC14 |
|     and | ) | |
| CALISTA P., | ) | Honorable |
|     Respondent-Appellee. | ) | Kevin J. Ward, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.

Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgment for dissolution of marriage as modified on reconsideration, holding (1) petitioner did not show its award of sole parental decision-making authority to respondent was against the manifest weight of the evidence, (2) petitioner did not show its award of parenting time was contrary to the best interest of the child, (3) petitioner failed to show the award of retroactive child support was an abuse of discretion, and (4) petitioner forfeited his claim that the allocation of marital property and debt was an abuse of discretion by failing to support it with adequate argument.

¶ 2    In April 2023, petitioner, Jonathon P., filed a petition for the dissolution of marriage between himself and respondent, Calista P. In November 2023, the trial court entered a judgment of dissolution of marriage, and, in February 2025, it modified the judgment on reconsideration. The court ruled respondent would have sole parental decision-making authority for the parties' child. It ordered the parties to receive parenting time according to the court's parenting plan, which gave respondent five days a week of parenting time. It found petitioner should pay $11,174.98 in

retroactive child support but should receive credit for $14,000 already paid. Finally, to equalize the distribution of marital property, it ordered petitioner to pay $28,481 to respondent. Petitioner appeals, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4           The parties were married in August 2020 but had been in a relationship since 2013. On the date the trial court dissolved the parties' marriage, their only child, J.P. (born in August 2019), was five years old. The parties separated in October 2022.

¶ 5                              A. Preliminary Proceedings

¶ 6           In June 2023, the mediator selected by the parties, Kim Roddick, filed a report indicating the parties had reached a full agreement on allocation of parental responsibilities and a partial agreement on parenting time. In August 2023, the trial court entered an order for interim child support requiring petitioner to pay $1,000 a month.

¶ 7                        B. The Report of the Guardian *ad Litem*

¶ 8           In June 2024, the trial court appointed Roddick to serve as guardian *ad litem* (GAL) for J.P. The GAL report recommended respondent receive full decision-making authority and the majority of parenting time. She concluded that both parents could provide appropriate homes for J.P. and were capable of caring for her. However, shared custody was unsuitable because the parents could not communicate effectively and disagreed about J.P.'s upbringing. The GAL further concluded the parties' inability to communicate effectively made the then-existing 50-50 shared parenting time schedule contrary to J.P.'s best interest.

¶ 9           The GAL reported her mediation in June 2023 resulted in the parties agreeing to a "2-2-3 days per week rotation" to create equal parenting time and joint decision-making in all major areas of J.P.'s upbringing. A year later when the GAL again conducted a mediation session

in anticipation of a possible trial, she learned that both parties deemed the status quo unacceptable.

¶ 10        The GAL spoke with the parties, J.P., and petitioner's girlfriend, Morgan Jakel. The GAL had "reviewed emails and texts between the parties that were provided to [her] by [petitioner]" and "interviewed friends, family, former business partners, daycare providers, and [Jakel]."

¶ 11        Respondent told the GAL she separated from petitioner because of her concerns about his aggressive behavior. Respondent reported:

> "[A]pproximately five or six years into the relationship, [petitioner] began getting physically aggressive toward her. He has not hit her, but he has broken his hand on two occasions by hitting a wall and his car when he was angry with [her]. The last incident led [her] to leave the marital home as she was intimidated by his actions. As far as [she] knows, he has never directed his physical aggression toward the minor."

¶ 12        The GAL found both parties' homes were close to each other and were physically appropriate places to raise J.P. Both parties expressed a preference for J.P. to attend school in Scales Mound, Illinois.

¶ 13        J.P. appeared to have "a close and loving relationship with [both] her parents." The friends and family members agreed respondent was the parent who ensured J.P. attended family events for both her sides of the family. Respondent had been the primary care provider for J.P. during the parties' relationship. Petitioner had become more involved with J.P.'s care since the parties separated.

¶ 14        The GAL provided her impressions of both parties, starting with petitioner:

> "[Petitioner] is a very driven person who is determined to provide a better life for

his daughter than he feels he had as a child. Earning money is important to him because it affords him the opportunity to provide for his family. *** He sees one's appearance as a factor in achieving success. He controls what the minor wears and there is little room for her to choose. He believes he can provide a more structured and success driven environment for his daughter."

The GAL noted petitioner was concerned respondent "did not respect or conform to his moral standards." An example of this was respondent's willingness to allow J.P. to wear visible temporary tattoos. He did not identify any sexual or criminal behavior by respondent as moral concerns. He believed J.P. was safe in respondent's care. The GAL stated that "the tattoo issue" had caused petitioner to end an informal agreement under which respondent cared for J.P. when petitioner had to work when he had parenting time scheduled.

¶ 15        The GAL learned petitioner suffered a heart attack in 2024 and had stents inserted. "He continue[d] to smoke and consume alcohol although he ha[d] been advised not to by his health care providers." Petitioner said he was "doing well" and had "reduced his stress levels, including the stress caused by his previous employment." The GAL saw no indication petitioner had substance abuse problems.

¶ 16        The GAL concluded respondent was welcoming of family and friends and declined to say anything negative about petitioner. She was a "devoted mother whose primary concern [was] her daughter" and "appear[ed] to have a good moral compass and [strived] to set a good example for her daughter."

¶ 17        The GAL determined the parties could not communicate effectively with one another. She believed petitioner's "critical and judgmental" demeanor and controlling behavior was a major source of the rift:

"[Petitioner] makes it clear that he doesn't think [respondent] is considerate of others, as organized as she should be, as smart as he is nor as cultured as he is. His emails tend to lecture her. [He] shared with me a year's worth of emails and texts between him and [respondent]. Many of those were condescending and critical. [Respondent] has said he has always been controlling to the point of choosing [her] clothes. Others have said he controlled her by not allowing her to work outside the home and not providing her with a car at times."

The GAL noted she had told petitioner she was "concerned that he has unreasonable expectations about how much control he has over decisions made by [respondent] in her home." She deemed his "attempts to control [respondent's] decision making ha[d] led to [her] shutting down phone calls and texts between them and restricting her communication to email."

¶ 18                 C. The Parties' Proposed Dissolution Orders

¶ 19       Both parties filed proposed dissolution orders. As it pertained to parenting, petitioner proposed "he [be] granted the majority of parenting time and granted sole and exclusive decision-making authority regarding [all significant] decisions." He proposed that "Respondent have parenting time every other weekend" and the parties share time equally during the summer months. Respondent proposed she receive sole decision-making authority for all significant decisions. She proposed petitioner's parenting time be limited to every other weekend and every Wednesday overnight.

¶ 20                       D. The Trial

¶ 21       The parties agreed the GAL would testify as a witness for both parties at trial. Both parties testified, as did Jakel, Joseph Milliken (respondent's paramour), Courtney Kress (a close friend of respondent's), and Bridget Bradley (respondent's mother).

¶ 22       The trial court considered the GAL's report and noted the GAL's testimony was consistent with her report. (To avoid unnecessary repetition, we do not discuss her testimony in detail here.) The court also concluded, "All non-party witnesses were credible but, except for GAL, added nothing useful due to their respective, obvious biases." The court "relie[d] on the evidence adduced through the parties and GAL for purposes of ruling." As such, we need not detail the testimony of the other nonparty witnesses. However, petitioner asks us to consider a small portion of Jakel's testimony as follows. Jakel, when asked whether she believed respondent supported J.P.'s relationship with petitioner, responded that J.P. had made multiple comments, like, "[P]apa why doesn't *** mama like you?" and, "[W]hy does she call you a bully?"

¶ 23                              1. *Petitioner's Testimony*

¶ 24       Petitioner testified he believed one parent should have sole decision-making authority because he and respondent did not communicate well enough to share authority. He thought he should have that authority because he believed communications would deteriorate further if respondent had that authority. He believed he should have the majority of the parenting time to limit his need to communicate with respondent and because he had concerns about respondent's "decisioning process," he was more likely to make the right choices for J.P.

¶ 25       Petitioner testified respondent did not honor their agreements and failed to timely respond to his communications. When petitioner responded, her answers were often incomplete or unsatisfactory. Some of this uncommunicativeness complicated arrangements for J.P.'s care or her participation in events. It also hindered mediation. Petitioner described trying to communicate with respondent as "exhausting."

¶ 26       Petitioner described multiple incidents illustrating his frustration with both the contested agreements and the slow communications. We summarize his testimony relating to two

- 6 -

incidents. The first is the incident relating to the "tattoo issue" mentioned by the GAL and discussed in detail by respondent. The second is an incident relating to a daddy-daughter dance.

¶ 27        Petitioner testified he and respondent had agreed J.P. could wear temporary tattoos only where they would be covered by shorts and a short-sleeved top, but respondent did not comply with this when she brought J.P. to his house on Valentine's Day. According to petitioner:

> "I had planned a little date night with [J.P.] for Valentine's because she was going to be my Valentine. And I bought her a new dress. A pretty little dress, a new pair of shoes, a new hair bow, a new everything. I was really excited for it and I got [J.P.] home from school that day and went to change her and down both arms and down both of her legs like big old artificial or fake tattoos. I know they are fake and they come off *** but [I would] actually have to try and use rubbing alcohol and stuff. *** [That] really dries out her skin. But really, I mean it honestly it really broke my heart. I literally had to walk away from the room and I cried because I was so excited to you know have my little girl wear this dress and go on the date with me. *** [B]ut it was incredibly frustrating."

¶ 28        This incident caused him to make the "heartbreaking decision" to stop allowing respondent to care for J.P. when he was working. He said this was not because of the tattoos but "about [respondent's] lack of respect" for him. Respondent was "not honoring [his] values and wishes." When asked why respondent's letting J.P. wear the tattoos mattered, he said, "Trust." When asked why a play tattoo on a five-year-old mattered at all, petitioner explained that he wanted her

> "to understand that she is beautiful in the skin that she came in. *** She doesn't need ten pounds of makeup on her face to be beautiful. She's gorgeous the way she

is. *** I don't want her to go get a paragraph on her forearm the day she turns 18."

¶ 29    In another instance, petitioner learned there was an "an upcoming daddy/daughter dance with the ARC[, J.P.'s daycare provider]," which was taking place on respondent's day to care for J.P. He explained he felt

> "it would be a great experience for [J.P.] with [him]self and *** with [respondent] because [J.P.] could get all prettied and dolled up with mom and get her hair done, makeup done, and whatever and then have the time with me at the dance and then be returned to her mom."

However, respondent failed to answer him, so J.P. "missed out on the experience."

¶ 30    Petitioner said he had a "minor heart attack" in November 2023 and had "a couple of stents inserted." He thought his heart attack was attributable to "a massive amount of stress," some of which came from working 50 to 55 hours a week as a sales manager at an automotive dealership. However, at another point in his testimony, he explained the stress associated with his relationship with respondent had "taken years off of [his] life" and respondent was "the stress that caused [him] to have a heart attack." He said there were "countless emails of [him] begging [respondent] to get along."

¶ 31    Petitioner testified he had worked as a sales manager at Barkau Automotive for about four years and made about $200,000 a year. However, he had been unemployed since April 2024, when the owners told him they wanted to cut his pay by $30,000 so they could hire another employee. He "stood up for [his] value," and, after two weeks, the owners fired him for refusing to accept the reduced pay. He was taken by surprise when he was fired "on the spot."

¶ 32    Petitioner did not attempt to obtain unemployment benefits, stating, "It didn't feel like the right thing to do." He explained he understood that, to accept unemployment benefits, he

would have to agree to accept employment with much lower pay even though he would leave that job as soon as he could. He asserted, "That's a just a waste of people's time and that's not what the system is designed for" and, if he accepted benefits, he "would be cheating the system." He believed the benefit he would have received was $3,600 a month.

¶ 33       He did not have any income after he lost his job and was living on the money in his 401(k) account, which he had drawn down by approximately $43,000. He agreed he had only roughly $7,000 remaining in his 401(k) account to live on.

¶ 34       Petitioner stated he was "not actively engaged in trying to go work for someone else" but was "working on other avenues." He conceded if he started his own automotive sales business, he would not be making "even close" to $200,000 a year and, because his income would be based on sales, he had no idea what it would be. The only step he had taken toward starting the business was "[r]esearch." He said, because he was "handcuffed" by the divorce process, he could not actively start setting up his business. He was concerned any business he started would be considered a marital asset. However, he believed the lease for business premises would be about $3,000 a month. He intended to borrow against the equity in his house to start the business but had not applied for a loan.

¶ 35                                    2. *Respondent's Testimony*

¶ 36       Respondent testified, while she was living with petitioner, she rarely had any employment; petitioner "preferred [she] didn't." She agreed she took care of most of the household chores, and, after J.P. was born, provided for "all [J.P.'s] daily needs." Because of petitioner's work schedule, he saw J.P. for about an hour before she went to sleep on his workdays, which included Saturdays. He was home all day only on Sundays.

¶ 37       According to respondent, her relationship with petitioner had generally been good,

but they had arguments. She also found some of his treatment of her "demeaning." For instance, "one of his favorite phrases was rubbing [her] face and saying shhhh pretty." After she explained she did not like this, petitioner made a regular joke of it. She started to laugh at it. However, she said "it has been clear that over the years that he still thinks [she's] not as smart."

¶ 38 About nine months after J.P.'s birth, she and petitioner had an argument that resulted in him breaking his arm by punching a wall. Petitioner later broke his hand when he punched his truck. Respondent decided to separate from petitioner after the argument where petitioner broke his hand. She believed the separation was necessary because the argument occurred in front of J.P.

¶ 39 The parties had difficulty communicating after they separated. Respondent considered the abusive character of petitioner's communications to be a major source of their difficulties. She authenticated copies of multiple texts and e-mails between herself and petitioner. One undated e-mail from respondent read as follows:

"Who are you and what did you do with my wife? Please go back to where you came from and send [respondent] back. I am tired of living this way. You continue to disrespect me, my efforts, and my time. You refuse to compromise on anything. It is your way or nothing. You refuse to communicate. That is not how life works. I will honor the schedule we agreed upon today, but I am not going through this again next month. *** It is complete bullshit that if I want to do something a different way or disagree with you, your default response is get a lawyer.

Congratulations, you've successfully sucked the last bit of life out of the person that has cherished you the last nine years. You finally broke me. I can't live

this way anymore. If this is how you want it to be, I'm out.

I love you[.]"

Respondent indicated this was characteristic of the communications that made it impossible for them to share decision-making authority.

¶ 40    Respondent's testimony agreed with the GAL's conclusion petitioner was highly concerned with appearance. He did not like respondent wearing leggings and sweatshirts. He would not tell her to change her clothes, but he would comment unfavorably on what she was wearing. He did not like J.P. wearing leggings either and preferred she not wear T-shirts with graphics because these were "just not something you would wear to work."

¶ 41    Respondent was pregnant by Milliken, her paramour, at the time of trial. She hoped to leave her rented home in Scales Mound to live with Milliken in Winslow, Illinois (which is about 25 miles from Scales Mound). However, although she had investigated the school J.P. would attend as a Winslow resident, respondent testified she remained committed to having J.P. attend Scales Mound schools, even if that meant she had to stay in Scales Mound herself.

¶ 42    Respondent testified she had been employed full-time for a year and a half earning $18 an hour as a "front desk lady." Her employer was understanding and modified her work schedule to enable her to drop J.P. off at daycare before starting her workday.

¶ 43                    E. The Dissolution Judgment

¶ 44    In November 2024, the trial court entered a judgment for dissolution of marriage. It determined that it was in J.P.'s best interest that respondent have full decision-making authority and the majority of parenting time. It ordered petitioner to pay $1,457.71 a month in child support, retroactive to May 2023. Finally, it ordered petitioner to pay respondent $28,481 to equalize the property distribution.

¶ 45 The trial court made five general findings relevant to the allocation of parenting time and decision-making authority. First, it found that the parties could not communicate with each other in any functional manner. Second it found that "Petitioner is controlling, unyielding, quick to disproportionate anger, and patronizing as to Respondent. Respondent withdraws and disengages from any interactions with Petitioner. She selectively, in passive aggressive fashion, responds to Petitioner's legitimate, albeit excessively demanding, inquiries about [J.P.]. Or she ignores him altogether." Third, after petitioner lost his job, "the parties' inability/unwillingness to communicate or cooperate with respect to [J.P.] *** reached dizzying heights of dysfunction." Fourth, it found that neither party disputed that both parties were capable of caring for and making decisions for J.P. Fifth and finally, it found that most of the criteria for the determination of a child's best interest under section 102(7) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/102(7) (West 2024)) had been "undermined" by the parties' behavior. It therefore concluded that the best solution was to fashion an order to "minimize conflict."

¶ 46 Turning to decision-making authority, the trial court found 8 of the 14 statutory factors in section 602.5(c) of the Act (*id.* § 602.5(c)) that related to the allocation of decision-making authority were "the overarching concerns here," and made findings concerning those factors. It found, *inter alia*, that "Respondent has demonstrated a greater willingness and ability to facilitate and encourage a close and continuing relationship between Petitioner and the child."

¶ 47 Concerning parenting time, the trial court found 8 of the 16 specific statutory factors set out in 602.7(b) of the Act (*id.* § 602.7(b)) to be salient. It found, among other things, that "Respondent was primary caretaker until about 6 months prior to trial" and "Respondent has demonstrated a greater willingness and ability to place the needs of the child ahead of her own needs."

¶ 48    Turning to the financial issues, the trial court further found petitioner was voluntarily unemployed and had "voluntarily impoverished himself." It imputed to him the reduced salary he had rejected at his former employer, $170,000 a year, or $14,167 a month. It found nothing in the facts was inconsistent with the application of an order for child support that followed the guidelines of section 505(a)(1.5) of the Act (*id.* § 505(a)(1.5)), and, pursuant to those guidelines, ordered petitioner to pay child support of $1,457.71 a month. The court exercised its discretion to make its award of $1,457.71 a month retroactive to May 2023. Consequently, petitioner had an arrearage of $12,238.78, which the court ordered him to pay down at the rate of $150 a month.

¶ 49    Petitioner moved for reconsideration. Among other things, he noted the trial court had made an error as to insurance costs. The court denied his motion as to most issues. However, it agreed it had made an error in addressing insurance costs and adjusted respondent's child support payment to $1,398.61 a month and the child support arrearage to $11,174.98.

¶ 50    This appeal followed.

¶ 51                                    II. ANALYSIS

¶ 52    We note this is an accelerated appeal under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018). Under that rule, this court is required to issue its decision in an accelerated case within 150 days of the filing of the notice of appeal unless there has been "good cause shown." *Id.* In this case, petitioner filed his notice of appeal on March 26, 2025, so the disposition of this court was due to be filed on August 25, 2025, which has passed. We note the parties between them filed seven unopposed motions for extension of time to file their briefs, the last of which we granted on August 12, 2025. Given these extensions, we conclude there is "good cause shown" (*id.*) for issuing our disposition after the 150-day deadline.

¶ 53    On appeal, petitioner raises four claims of error. First, he argues the trial court's decision to award respondent sole authority to make major parenting decisions was against the manifest weight of the evidence. Second, he argues the court's allocation of parenting time was contrary to J.P.'s best interest. Third, he argues the award of retroactive child support was an abuse of discretion because it gave respondent a "windfall." Fourth, he argues the allocation of debt and marital property was inequitable. We address each claim in turn.

¶ 54                    A. Decision-Making Authority

¶ 55                    1. *The Parties' Arguments*

¶ 56    Petitioner argues the trial court erred in awarding sole authority to make major parental decisions to respondent and argues he "demonstrated an ability and willingness to communicate with [respondent] about the child through any medium at any time," whereas respondent "often simply [did] not respond or barely respond[ed]." He contends respondent's unwillingness or inability to collaborate with [him] was erroneously deemed by the court as a failure of both parties to communicate.

¶ 57    Petitioner's remaining arguments address three of the eight statutory factors addressed by the trial court. Beyond its general findings of fact relating the parties' relationship and communication problems, it found that 8 of the 14 statutory factors in section 602.5(c) of the Act that relate to the allocation of decision-making authority were "the overarching concerns here." The factors at issue are as follows:

> "(2) the child's adjustment to his or her home, school, and community;
>
> (3) the mental and physical health of all individuals involved;
>
> * * *
>
> (11) the willingness and ability of each parent to facilitate and encourage a close

and continuing relationship between the other parent and the child." 750 ILCS 5/602.5(c)(2), (3), (11) (West 2024).

¶ 58 The rulings petitioner challenges are:

"(2) the child is clearly well adjusted to both parents' homes, her school, and community. Her young age suggests she would readily adjust to any near future changes;

(3) Petitioner's recent heart attack and inclination toward anger, including self-harm through striking objects, suggest concerns about his mental and physical well being;

\* \* \*

(11) Neither party is blameless in the deterioration of their relationship or ability to communicate/cooperate, but Respondent has demonstrated a greater willingness and ability to facilitate and encourage a close and continuing relationship between Petitioner and the child[.]"

¶ 59 Petitioner argues the trial court should have made a different finding under 602.5(c)(2) of the Act (*id.* § 602.5(c)(2))—regarding "the child's adjustment to his or her home, school, and community." He argues he would provide a higher degree of stability than respondent because respondent indicated she would like to move to her paramour's home some distance away, whereas he "has no intention of moving from the former marital residence."

¶ 60 Second, petitioner argues, when the trial court "suggest[ed] concerns about his mental and physical well being," the court improperly considered matters which did not affect his relationship with J.P.

¶ 61 Third, he argues the trial court erred in finding "Respondent has demonstrated a

greater willingness and ability to facilitate and encourage a close and continuing relationship between Petitioner and the child. He argues, because, J.P. made a comment about him being a bully and asked " '[W]hy doesn't mama like you?' " respondent disparaged him in front of J.P. He points out he had a "great relationship with the child's maternal grandmother and other family members and would never attempt to separate the child from [respondent or her] family."

¶ 62        In response, respondent argues the trial court's finding the parties were incapable of shared decision-making was well supported by the evidence and legally proper. She cites the evidence extensively, asserting that the court did not err in describing petitioner as controlling.

¶ 63        In reply, petitioner asserts the award of full decision-making authority to respondent was against the manifest weight of the evidence because the failure to communicate was primarily respondent's fault. He further contends, "Because of the court's erroneous ruling, [respondent], the individual who could not make reasoned decisions for the minor child, was granted sole decision-making authority for her."

¶ 64                              2. *The Law*

¶ 65        Under section 602.5(a) of the Act (*id.* § 602.5(a)), the trial court "shall allocate decision-making responsibilities according to the child's best interests." When determining a child's best interest regarding the allocation of decision-making authority, the trial court must consider "all relevant factors," (*id.* § 602.5(c)), including the eight quoted by the court in its written decision.

¶ 66        A reviewing court should not disturb a trial court's determination of the allocation of decision-making authority unless that determination is against the manifest weight of the evidence. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 64. "Under the manifest weight standard, [the reviewing court] give[s] deference to the trial court as the finder of fact because it is in the

best position to observe the conduct and demeanor of the parties and witnesses." *Best v. Best*, 223 Ill. 2d 342, 350 (2006). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.* The burden is on petitioner as the appellant to affirmatively show error. See *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 48 (so holding as to the defendant in a criminal case); see also *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-32 (1976) (stating the burden of persuasion remains with the appellant despite the appellee's failure to file a brief).

¶ 67                                     3. *This Case*

¶ 68        Petitioner has not shown his superiority as decision-maker is "clearly evident" or that the trial court's finding respondent was the superior decision-maker was "not based on the evidence presented." *In re Marriage of Kriley*, 2025 IL App (1st) 241923, ¶ 69. Petitioner picks around the edges of the statutory factors without presenting anything resembling an argument that it was contrary to J.P.'s best interest to have respondent be given sole responsibility for making major decisions. Moreover, his arguments concerning the statutory factors are unpersuasive. Here, neither party disputes the conclusion they were incapable of working together to make decisions for J.P. Both parties presented superabundant evidence tending to show this incapacity. However, each agreed the other was "capable of fulfilling the obligations of parenting a child." Thus, the only determination the trial court had to make in this regard was which parent would better serve J.P.'s best interest when exercising decision-making authority. Petitioner cannot show the court made the wrong determination.

¶ 69        a. The Trial Court's Ruling on Communications Between the Parties

¶ 70        Petitioner first contends the trial court erroneously blamed him for the parties'

failure to communicate, but he mischaracterizes the court's findings. He asserts "respondent's willingness or inability to collaborate with [him] was erroneously deemed by the court as a failure of both parties to communicate." But the court found, "Respondent withdraws and disengages from any interactions with Petitioner. She selectively, in passive aggressive fashion, responds to petitioner's legitimate, albeit excessively demanding, inquiries about [J.P.]. Or she ignores him altogether." Thus, the court made its decision *despite* concluding respondent was the one declining to communicate, while *also* finding "Petitioner is controlling, unyielding, quick to disproportionate anger, and patronizing as to Respondent." The latter finding explains why the court did not conclude respondent was solely responsible for the parties' inability to make joint decisions. Indeed, the finding concerning petitioner suggests, even if he had been without fault, the two would have been unlikely to be able to make joint decisions for their child.

¶ 71                                    b. Section 602.5(c)(2)

¶ 72            Addressing the trial court's determination under section 602.5(c)(2) of the Act (750 ILCS 5/602.5(c)(2) (West 2024)—regarding "the child's adjustment to his or her home, school, and community"—petitioner argues that his plan to stay in Scales Mound would offer J.P. more stability. However, this argument does not address the court's finding that, due to J.P.'s young age, she would likely adjust easily to any upcoming changes. The supporting evidence shows J.P., who was five at the time, had adjusted well to her parents' separation and the arrangement of living in two different places. Furthermore, considering petitioner's voluntary impoverishment and uncertain employment prospects, this court would find it questionable that petitioner would continue to provide a more stable environment.

¶ 73                                    c. Section 602.5(c)(3)

¶ 74            Petitioner contends the trial court's finding pursuant to section 602.5(c)(3) that his

"recent heart attack and inclination toward anger, including self-harm through striking objects, suggest concerns about his mental and physical well being" was improper. We disagree. Section 602.5(c)(3) of the Act (*id.* § 602.5(c)(3)) requires the court to consider the "mental and physical health of all individuals involved." Petitioner fails to show how the court misapplied the section 602.5(c)(3) requirement to consider the parties' health issues.

¶ 75        Section 602.5(e) of the Act (*id.* § 602.5(e)), and *In re Marriage of Craig*, 326 Ill. App. 3d 1127 (2002), on which petitioner relies, do not support his position. Section 602.5(e) provides: "In allocating significant decision-making responsibilities, the court shall not consider conduct of a parent that does not affect that parent's relationship to the child." 750 ILCS 5/602.5(e) (West 2024). *Craig*, interpreting a predecessor to section 602.5(e), held, "Although it is improper for a court to presume harm to a child, based on the parents' allegedly immoral conduct, evidence bearing on the stability of the child's environment is obviously relevant." *Craig*, 326 Ill. App. 3d at 1129. Here, the two health issues raised by the trial court bore on the stability of J.P.'s environment. First, a heart attack, even a "minor" one, is a significant medical event that raises concerns about petitioner's overall health. Second, the incidents where petitioner broke his bones indicate he had substantial issues with anger management. The degree of anger required to cause a person to punch anything hard enough to break his own bones is surely extreme. The court therefore had evidence upon which it could conclude petitioner's anger management problems were a threat to the stability of J.P.'s environment.

¶ 76                                d. Section 602.5(c)(11)

¶ 77        Petitioner contends the trial court erred in finding, pursuant to section 602.5(c)(11) of the Act (750 ILCS 5/602.5(c)(11) (West 2024)), respondent had a greater "willingness and ability *** to facilitate and encourage a close and continuing relationship between the other parent

and the child." We disagree. The court found "[n]either party is blameless in the deterioration of their relationship or ability to communicate/cooperate, but Respondent has demonstrated a greater willingness and ability to facilitate and encourage a close and continuing relationship between Petitioner and the child." Petitioner has not shown this finding is against the manifest weight of the evidence.

¶ 78 Petitioner asks us to, in effect, reweigh evidence relating to section 602.5(c)(11) and reconsider the inferences to be drawn from that evidence. That is not our role. As *Best* reminds us, we must defer to the trial court as the finder of fact "because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 350. The court heard hours of testimony from both parties describing incidents, the facts of which were contested. It also admitted copies of many text-based communications between the parties. We are not in the position to evaluate the court's credibility determinations concerning the contested facts or to second-guess the weight the court gave to the various incidents.

¶ 79 Our standard of review nevertheless permits us to determine whether "the opposite conclusion is clearly evident or if the finding is not based on the evidence presented." *Kriley*, 2025 IL App (1st) 241923, ¶ 69. Petitioner has not persuaded us this is the case.

¶ 80 First, the evidence pointed to a degree of irrationality in both parties' behaviors. The intensity of petitioner's reaction to the tattoo incident and the shear unpleasantness of the e-mails reproduced above are enough to prevent the evidence from being one-sided. Thus, the opposite conclusion cannot be *clearly* evident.

¶ 81 Second, the trial court's findings are based on the evidence presented. For example, the tattoo incident is evidence of petitioner's controlling tendencies, his unyieldingness, and his disproportionate anger. His testimony he had concerns about respondent's "decisioning process"

illustrates his patronizing attitude. To be sure, petitioner presented testimony from Jakel suggesting respondent disparaged him in front of J.P., but that evidence was just one small piece of a mountain of evidence the law required the court to weigh.

¶ 82                                    B. Parenting Time

¶ 83                                    1. *The Parties' Arguments*

¶ 84        Petitioner, applying a contrary-to-the-manifest-weight-of-the-evidence standard of review, alleges the allocation of parenting time was contrary to J.P.'s best interest. First, he contends the trial court erred in finding "Respondent was primary caretaker until about 6 months prior to trial." He argues that since he and respondent had equal parenting time for two years before the trial, it is incorrect to claim respondent was the primary caretaker. Second, he contends the court, by neglecting to address the equal parenting time schedule the parties had during their separation, failed to give any "meaningful weight" to section 602.7(b)(4) of the Act (750 ILCS 5/602.7(b)(4) (West 2024)). This section mandates consideration of any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child. Third, he claims the court improperly focused on the lack of cooperation between the parties, which, he argues, should not be a "determinative factor." Fourth, he argues the court gave too much weight to the GAL's determination he was controlling and demanding. Finally, he argues, "[i]n allowing the communications between [himself] and [respondent] to be a determinative factor, the court and GAL lost sight of the fact that the equal parenting time status quo maximized the involvement of both parties in the child's life."

¶ 85        In response, respondent argues the trial court considered all relevant statutory factors. She further contends the court's findings on each factor were supported by the evidence.

¶ 86                                    2. *The Law*

¶ 87                              a. The Parenting Time Standard

¶ 88            Section 602.7(a) of the Act (*id.* § 602.7(a)) provides a trial court "shall allocate parenting time according to the child's best interests." When the court allocates parenting time, it is to consider "all relevant factors," including the 17 factors outlined in section 602.7(b) of the Act (*id.* § 602.7(b)). Those factors include "the willingness and ability of each parent to place the needs of the child ahead of his or her own needs," (*id.* § 602.7(b)(12)) and "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child" (*id.* § 602.7(b)(13)).

¶ 89            Here, the trial court made findings on each of the factors. Pursuant to section 602.7(b)(3) (*id.* § 602.7(b)(3)), it found, "Respondent was primary caretaker until about 6 months prior to trial." Pursuant to section 602.7(b)(4) (*id.* § 602.7(b)(4)), it found, "[T]he parties' recent prior course of conduct demonstrates they will not cooperate to establish a parenting time schedule in the child's best interests." Pursuant to section 602.7(b)(9) (*id.* § 602.7(b)(9)), it found the parents demonstrated an overall inability to cooperate. Pursuant to section 602.7(b)(12) (*id.* § 602.7(b)(12), it found, "Respondent has demonstrated a greater willingness and ability to place the needs of the child ahead of her own needs." Pursuant to section 602.7(b)(13) (*id.* § 602.7(b)(13)), it found, "Neither party is blameless in the deterioration of their relationship or ability to communicate/cooperate, but Respondent has demonstrated a greater willingness and ability to facilitate and encourage a close and continuing relationship between Petitioner and the child."

¶ 90                              b. The Standard of Review

¶ 91            Petitioner asks us to review the allocation of parenting time as set out in *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 45, which holds an allocation of parenting time

should be reversed only if is against the manifest weight of the evidence. Our courts have not reached a consensus on the standard of review regarding decisions on parenting time. Respondent cites *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 53, which holds, "A reviewing court will disturb a circuit court's ruling on parenting time 'only if it is against the manifest weight of the evidence, is manifestly unjust, or is the result of an abuse of discretion' " (quoting *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21). The question of whether the division of parenting time was against J.P.'s best interest is a question of fact and should be reversed only if it is against the manifest weight of the evidence. *In re Marriage of Young*, 2015 IL App (3d) 150553, ¶ 12. The burden is on petitioner as the appellant to affirmatively show error. See *Jefferson*, 2021 IL App (2d) 190179, ¶ 48 (so holding as to the defendant in a criminal case).

¶ 92                                   3. *This Case*

¶ 93          Petitioner first argues the trial court was incorrect that respondent "was primary caretaker until about 6 months prior to trial." We disagree. To be sure, the parties initially agreed to equal parenting time. But section 602.7(b)(3) of the Act concerns "the amount of time each parent spent performing *caretaking functions*." (Emphasis added.) 750 ILCS 5/602.7(b)(3) (West 2024). It was uncontested, until he became unemployed, petitioner worked approximately 60 hours a week, including Saturdays. Thus, before the tattoo issue arose, respondent performed the caretaking functions when petitioner's parenting time coincided with his work. After the tattoo incident, Jakel did the same. Thus, although petitioner was certainly *a* caretaker after he and respondent separated, he could not be an *equal* caretaker until he became unemployed.

¶ 94          Second, petitioner argues the trial court neglected to address the equal parenting time schedule the parties had during their separation. Petitioner claims the court failed to give any "meaningful weight" to section 602.7(b)(4) of the Act (*id.* § 602.7(b)(4)), which mandates

consideration of any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child. Again, we disagree. The court found "the parties' recent prior course of conduct demonstrates that they will not cooperate to establish a parenting time schedule in the child's best interests." In any event, neither party favored equal parenting time. Petitioner wished to limit respondent's parenting time to every other weekend, except during the summer.

¶ 95 Third, petitioner argues the trial court improperly used cooperation between the parties as the determinative factor in allocating parenting time. We are unpersuaded the court gave exceptional weight to the communications problems between the parties. The court addressed the eight statutory factors it deemed salient. The court commented specifically on the poor communications between the parties in a passage preliminary to its decisions on decision-making authority and parenting time. Petitioner has not demonstrated any improper impact of those introductory findings on the parenting time decision.

¶ 96 Fourth, petitioner argues the trial court gave too much weight to the GAL's determination he was controlling and demanding. Petitioner suggests the GAL was biased because she spent more time with respondent. We reject this argument. Again, as *Best* reminds us, we must defer to the court as the finder of fact "because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 350. "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 39. Here, petitioner fails even to show conflicting evidence existed. As noted above, evidence from petitioner's testimony and communications supported the court's findings.

- 24 -

¶ 97        Finally, petitioner argues, "[i]n allowing the communications between [himself]

and [respondent] to be a determinative factor, the [trial] court and GAL lost sight of the fact that

the equal parenting time status quo maximized the involvement of both parties in the child's life."

We have rejected petitioner's argument and thus reject the premise of this argument.

¶ 98                              C. Financial Issues

¶ 99        As noted above, the trial court calculated petitioner's child support obligation based

on an imputed income of $170,000 a year (*supra* ¶ 48). Citing *In re Marriage of Abu-Hashim*,

2014 IL App (1st) 122997, ¶ 37, the court stated it had discretion to "award or not award"

retroactive child support. It awarded $1,457.71 a month retroactive to May 2023, and, based on an

interim child support award of $1,000 a month, calculated an arrearage of $12,238.78. Later the

court agreed it had made an error in addressing insurance costs, and it adjusted respondent's child

support payment to $1,398.61 a month and the child support arrearage to $11,174.98, with the

arrearage payment continuing to be $150 a month. The court did not comment on its rationale for

making the award retroactive.

¶ 100                      1. *Retroactivity of Child Support*

¶ 101                          a. The Parties' Arguments

¶ 102        Petitioner argues the award of retroactive child support was an abuse of discretion

and created a windfall for respondent. Citing section 505(a)(3.8) of the Act (750 ILCS

5/505(a)(3.8) (West 2024)) and *In re Marriage of Bush*, 191 Ill. App. 3d 249 (1989), he argues:

        "[N]othing was established [at] trial that the child needed for anything during the

        retroactive period that the award covered. Moreover, [section 505(a)(3.8) of the

        Act] now mandate[s] that the number of overnights that a parent exercises

        materially reduces the amount of child support to be paid. [Citation.] For these

reasons, it is unknown how else to characterize the payment other than a windfall which, given the case law, is an order no reasonable person would enter.

¶ 103    Respondent argues the shared custody was not what it appeared because, until April 2024, when petitioner became unemployed, she "provided care for [J.P.] on [petitioner's] days as well as her own." She thus contends support based on her being the primary caretaker was an appropriate exercise of discretion.

¶ 104                                  b. The Law

¶ 105    "It is within the trial court's discretion to award or not to award child support on a retroactive basis." *Abu-Hashim*, 2014 IL App (1st) 122997, ¶ 37. " 'A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court.' " *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, ¶ 47 (quoting *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005)). "Despite the requirement that a court consider a child's station in life, the courts are not required to automatically open the door to a windfall for children where one or both parents have large incomes." *Bush*, 191 Ill. App. 3d 249 at 261. "The Act was not intended to create windfalls but, rather, adequate support payments for the upbringing of the children." *Id.*

¶ 106    Petitioner reaches back 35 years to the Fifth District's decision in *In re Marriage of Rogliano*, 198 Ill. App. 3d 404, 410 (1990), to cite the standard that "[r]etroactive allowance of support in a dissolution proceeding is within the discretionary power of the trial court if such allowance is deemed fit, reasonable and just." We are not persuaded this is part of the contemporary abuse-of-discretion standard for retroactive child support. However, whether this standard applies makes no difference to the outcome.

¶ 107                                  c. This Case

¶ 108    The award of retroactive child support was not an abuse of discretion nor did it

create a windfall. Petitioner points out he and respondent were sharing parenting time evenly in the period preceding the final judgment but claims the child support award was based on respondent's having the majority of parenting time. He argues this made the award unjust. This argument fails. Petitioner's salary during most of the period at issue was $200,000, not $170,000. As such, if the court were to calculate a retroactive award based both on parenting time and petitioner's actual income, the change in parenting time would tend to lower the child support, but petitioner's higher salary would tend to increase it. The trial court arguably took a shortcut in its calculations by declining to correct these countervailing factors. However, petitioner has not shown this shortcut produced a result materially different from the more complicated calculation.

¶ 109 Moreover, petitioner has not attempted to explain how an additional $150 in child support constitutes a "windfall" in the sense intended by *Bush*. Indeed, *Bush* states:

> "[W]e know of no rule of law requiring excessive child support so that the child (or the custodial parent) can diminish the accumulation of an estate by the noncustodial parent. We are not required to equate large incomes with lavish life-styles. Neither are the courts required to provide opulence and excess as an award for child support simply because it exists for one of the parties." *Bush*, 191 Ill. App. 3d at 261.

The retroactive support of $11,174.98 the trial court ordered is not large enough to offer a lavish lifestyle to respondent or J.P.

¶ 110   2. *Equitable Distribution of Debt and Property*

¶ 111 Petitioner argues, by "allocating [him] 100% of the marital debts and saddling him with a child support obligation based upon an imputed *** income, the [trial] court did not accomplish its intended equal division of the marital estate, and its overall distribution of marital property and debt constitutes an abuse of discretion." As his sole support for this contention,

petitioner cites *In re Marriage of Goforth*, 121 Ill. App. 3d 673, 678 (1984), for the proposition that an "important objective to be reached by the trial court in entering [a dispositional order in a dissolution-of-marriage case] is to place the parties in a position from which they can begin anew, in addition to providing adequate support for the children." This, and a request for reversal and vacatur of the equalization payment to respondent, constitute the entirety of petitioner's argument.

> "Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires a party's brief to present argument, which must contain the contentions of the party and be supported by citation to the authority ***. A party must clearly define the issues to be decided and set forth cogent arguments in support of his or her position. [Citation.] A party forfeits an argument when he or she fails to adequately develop it." *Village of Downers Grove v. Village Square III Condominium Ass'n*, 2022 IL App (2d) 210098, ¶ 47.

¶ 112    Here, petitioner's argument amounts to little more than an assertion the trial court acted unfairly. Moreover, petitioner failed to cite any authority for the proposition we may consider a child support decision when addressing the fairness of a property distribution. "A contention that is supported by some argument but no authority does not meet the requirements of Rule 341 and is considered forfeited." *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045 (2009). Petitioner's patently insufficient argument on this point is, therefore, forfeited. As such, we do not address it.

¶ 113                                III. CONCLUSION

¶ 114    For the reasons stated, we affirm the trial court's judgment.

¶ 115    Affirmed.